UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOSE CLARK-HILERY,

    Plaintiff,

v.                                            Case No. 8:23-CV-00284-TPB-AEP

MARKETOPIA LLC,

    Defendant.
_____/

## **ORDER**

This matter comes before the Court upon Defendant's Motion for Summary Judgment (Doc. 57). Plaintiff initiated this action against his former employer, Defendant Marketopia LLC ("Marketopia"), alleging sexual discrimination, sexual harassment, and retaliation under both Florida and Federal law. Defendant now seeks summary judgment on all six counts in Plaintiff's Complaint. For the reasons state herein, Defendant's Motion (Doc. 57) is granted in part and denied in part.

**I.    Background**

Defendant Marketopia LLC is a marketing agency owned by Terry and Andra Hedden (Doc. 57-1, ¶¶ 4–5). On August 9, 2021, Plaintiff, a gay man, began working for Defendant as its Director of Call Center Services (Doc. 1, ¶¶ 9–10). In this role, Plaintiff was a part of Defendant's executive team and reported directly to Defendant's CEO, Terry Hedden (Doc. 1, ¶ 10; Doc. 57-1, ¶¶ 8–9). Between September 2021 and October 2021, three separate employees, Armani Cooper,

Jackson Bennet, and Josh Sellers, complained to the Defendant's then Director of Human Resources, Kim Roneree, about the Plaintiff's behavior toward them. (Doc. 57, ¶¶ 5–7; Doc. 68, at 3). Cooper alleged that in a conversation about their feet, Plaintiff told Cooper he would "suck the fuck out [Cooper's] toes" (Doc. 63-3, at 12:3–9). Bennet reported similar commentary, noting that Plaintiff had told him Plaintiff would be with Bennett if he were not married (Doc. 63-4, at 13:17–25). Sellers also expressed feeling uncomfortable with Plaintiff's comments concerning his body and a fear of retaliation from Plaintiff if he spoke up (Doc. 63-10, at 80–81). Dispute exists as to whether Ronoree reported any of these Complaints to the Heddens (Doc. 63-10, at 32:7–33:18; Doc. 57, ¶ 8; Doc. 63-14, at 14, p. 53).

On December 3, 2021, a review was left on Glassdoor[1] about Defendant which stated, "[i] love the CEO and he deserves better but the call center manager is getting away with sexual harassment and covered by human resources under the nose of the CEO" and advised the company to "[t]reat others the way you want to be treated - be aware of sexual harassment and put an end to it - help promote your top performers instead of firing them because they didn't reciprocate the sexual harassment." (Doc. 57-3, p. 37). The review was attributed to Sellers who had been fired by Plaintiff the previous day. (Doc. 68, at 4–5; Doc. 57-4, p. 4:11–5:4). Ms. Hedden learned about the review that same day and shortly thereafter tasked HR

---

[1] Glassdoor is a platform where job seekers and employers can find information about companies, including reviews, salaries, and job openings, helping users make informed decisions about their careers. *See* GLASSDOOR, https://www.glassdoor.com/index.htm (last visited March 14, 2025).

generalist Alex Hayes, who had recently taken on additional human resources responsibilities following the departure of Roneree in December 2021, with investigating the matter further (Doc. 57-2, ¶ 10–12; Doc. 57-3, p. 216:6–9, Doc. 68, p. 4–5).

On December 15, 2021, Ms. Hedden and Mayes met with Plaintiff to discuss complaints that had been made by or about Plaintiff's interactions and behaviors towards employees Amber Keeger, Misty Aquel, Tiffany Rivieccio, Brad Garinger, Armani Cooper, and Jackson Bennett (Doc. 64-1, p. 42–44). Ms. Hedden then sent an email to both parties recapping the discussion (Doc. 64-1, p. 42–44). In the email, Ms. Hedden noted that the goal of the meeting was:

> to ensure that anything brough to my or HR attention is addressed and discussed in an open and confidential fashion with the leader. Jose mentioned that many of these are old examples and he has since tightened up on the lightheaded jokes etc. He is working hard to be sensitive with the members on the floor so that situations do not come up such as this. I am looking forward to Jose continuing to do great work on the floor and with the tele leaders and executive team. I am glad we were able to have a healthy and productive conversation.

(Doc. 64-1, at 43). She further expressed that she had "no doubt that [Plaintiff] will work hard to ensure this type of feedback is not an issue." (Doc. 64-1, at 42). From December 16, 2021, through January 18, 2022, there is no record that Ms. Hedden or Ms. Hayes had any further meetings or discussions with Plaintiff concerning these complaints or any others. Further, there is little in the record to suggest that any sort of investigation was ongoing. Defendant argues that this pause was due to the fact that Ms. Hedden traveled in December, and Ms. Hayes was away in early January (Doc. 57, ¶ 15).

3

On January 18, 2022, Plaintiff had his 90-day review with Mr. Hedden (Doc. 57, ¶ 17; Doc. 68, p. 5–6). Prior to this meeting, Mr. Hedden solicited feedback concerning Plaintiff's performance from Tiffany Rivieccio, Jackson Bennett, Brad Garinger, and Scott Sullivan (Doc. 63-12, at 48:12–53:17). At the meeting, Mr. Hedden discussed some of the issues concerning Plaintiff's behavior that had previously been addressed by Ms. Hedden and Mayes as well as some other issues that had been brought to Mr. Hedden's attention. (Doc. 63-12, at 56:9–59:10). However, Plaintiff was told by Mr. Hedden that he "passed" his 90-day review and was offered UARs, "a form of equity related to the value of Marketopia," which according to Mr. Hedden was "100% of what anyone would hope for and more than most get" (Doc. 63-1, at 524; Doc. 63-12, at 54). Plaintiff, however, was bothered by how his 90-day review went, and specifically took issue with how "false accusations that have been investigated and proven false [were] thrown in [his] face again" (Doc. 63-1, at 524).

On January 19, 2022, Plaintiff sent Mr. Hedden an email detailing his grievances with certain topics that had been discussed at this review (Doc. 63-1 at 520–521). Additionally, Plaintiff expressed a personal grievance with Mr. Hedden for referring to his clothing choices as "flamboyant" in an executive meeting in September 2021 (Doc. 63-1 at 520; Doc. 63-1, at 198:16–200:16). Plaintiff stated that the use of the word was offensive to him as a gay man because "telling a gay man that he has any flamboyant tendencies whether the way he dressed, carries himself, acts, etc is putting him or anyone in the stereotype" (Doc. 63-1 at 520). Mr.

4

Hedden in turn responded with an email addressing Plaintiff's grievances point by point (Doc. 63-1, at 522–524). Specifically with respect to the flamboyant comment, Mr. Hedden pasted the definition of the word from the American Heritage Dictionary and argued that he had used it only to mean "showy" and that the word had nothing to do with "being gay, LGBTQ+, or anything else" (Doc. 63-1, at 523–524). The email chain quickly became heated, and Ms. Hedden and Melissa Santos, Marketopia's interim HR Director, were added to the chain, at which point Ms. Hedden scheduled a meeting on January 21, 2022, to "have a productive and executive conversation around the below communications" (Doc. 63-1, at 525–527). Following that meeting, a series of text messages were exchanged between Mr. Hedden and Plaintiff wherein Mr. Hedden expressed that it really meant a lot to him that Plaintiff had apologized for things he had said in the email as Mr. Hedden would never say or do anything intentional to hurt him. (Doc. 57-3, at 41). Plaintiff similarly acknowledged that in the future he would come and talk to Mr. Hedden directly if he felt something offensive had been said (Doc. 57-3, at 41).

Two days later, on January 24, 2022, Ms. Santos began conducting recorded interviews with Marketopia employees concerning accusations against Plaintiff. Ms. Santos alleges that Ms. Hedden came to her after the flamboyant comment controversy with a specific list of individuals and requested that she interview each (Doc. 63-14, at 34, p. 133:19–134:7; Doc. 63-15, at 44, p. 175:20–25). Ms. Hedden alleges that Ms. Santos was tasked with investigating the allegations against Plaintiff in mid to late December and plead ignorance as to the manner and timeline in which

Ms. Santos conducted her investigation. (Doc. 57, at 13; Doc. 57-2, ¶ 17). Regardless, from December 24th through December 27th, Ms. Santos conducted five recorded interviews with employees Tiffany Riveccio, Scott Sullivan, Sarah Black, Jackson Bennett, and Armani Cooper and spoke with employees Alex Mayes and Chantel Morton (Doc. 63-14, at 35–38; Doc. 64-1, at 100–150; Doc. 57, at 13). Following the conclusion of the last interview, Ms. Santos summarized her findings in a word document (hereinafter "investigative summary") and presented it to Ms. Hedden on December 27, 2024 (Doc. 64-1, at 81–84; Doc. 68, at 8; Doc. 57, at 13)[2]. Marketopia terminated Plaintiff later that day (Doc. 57, at 11; Doc. 68, at 9; Doc. 63-10, at 77–78). Plaintiff now brings claims of sexual harassment, sexual discrimination, and retaliation against Defendant (Doc. 1).

## II. Legal Standard

Summary judgment is appropriate where the movant demonstrates that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The existence of some factual disputes between litigants will not defeat an otherwise properly supported summary

---

[2] At deposition, Santos testified that she believed portions of the investigative summary had been altered and some on the conclusions and opinions detailed in Doc. 64-1, at 81–84 were not hers (Doc. 63-14, at 39).

judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Id*. at 247-48 (emphasis in original). The substantive law applicable to the claims will identify which facts are material. *Id*. at 248. In reviewing the motion, courts must view the evidence and make all factual inferences in a light most favorable to the non-moving party and resolve all reasonable doubts about the facts in favor of the non-movant. *Dadeland Depot, Inc. v. St. Paul Fire and Marine Ins. Co.*, 483 F.3d 1265, 1268 (11th Cir. 2007) (citation omitted). The movant "bears the initial responsibility of informing the district court of the basis for its motion[ ] and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (citing *Celotex Corp.*, 477 U.S. at 323). The burden then shifts to the nonmovant "to rebut that showing by producing affidavits or other relevant and admissible evidence beyond the pleadings." *Jones*, 683 F.3d at 1292 (quoting *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2012)).

### III. Analysis

In his Complaint, Plaintiff has brought claims for sexual harassment, sexual discrimination, and retaliation under both Title VII of the Civil Rights Act of 1964 ("Title VII") and the Florida Civil Rights Act ("FCRA"). As claims brought under the FCRA are analyzed under the same framework as claims brought under Title VII, the same determination will apply to both claims. *See Gibson v. JetBlue Airways*

*Corp.*, No. 20-10943, 2021 WL 5368056, at *3 (11th Cir. Nov. 18, 2021) (citing *Jones v. United Space All., L.L.C.*, 494 F.3d 1306, 1310 (11th Cir. 2007)).

### A. Sexual Harassment

To succeed on his claim for sexual harassment, Plaintiff must show: 1) he belongs to a protected group; 2) he was subject to unwelcome sexual harassment; 3) the harassment was based on his sex; 4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment and create an abusive working environment; and 5) a basis for holding Marketopia liable exists. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010). At issue here are elements two, three, and four (*See* Doc. 57, at 16–18; Doc. 68, at 12–15). Defendant maintains that Plaintiff cannot show conduct by anyone at Marketopia that would constitute harassment based on Plaintiff's sexual orientation, and *even if* Mr. Hedden's flamboyant comment could be categorized as such, it was an isolated incident which was not sufficiently severe or pervasive (Doc. 57, at 16–17). In response, Plaintiff argues that Mr. Hedden used the term flamboyant to describe Plaintiff more than once, and it was pervasive enough to cause Plaintiff to contemplate resigning (Doc. 68, at 14–15).

The Court begins its analysis by acknowledging that there is dispute as to whether the use of the term "flamboyant" could be considered anti-homosexual hostility. However, in viewing the evidence in the light most favorable to the non-moving party, the Court finds such conduct could be classified as sex-based

harassment. Thus, the Court turns to the fourth element, whether the harassment was sufficiently severe or pervasive, to determine the viability of Plaintiff's claim.

In evaluating whether harassing conduct is sufficiently severe or persuasive, courts consider both a subjective and objective component. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22 (1993). In short, a plaintiff "must subjectively perceive the environment to be abusive, and the conduct must be severe or pervasive enough to create an objectively hostile or abusive work environment." *Blackmon v. Wal-Mart Stores E., L.P.*, 358 F. App'x 101, 102 (11th Cir. 2009) (citing *Harris*, 510 U.S. at 21). In evaluating whether an environment is objectively hostile or abusive, courts are to consider: 1) the frequency of the discriminatory conduct; 2) its severity; 3) whether the conduct was physically threatening or humiliating; and 4) whether it unreasonably interfered with the employee's work performance. *Harris*, 510 U.S. at 23. However, as acknowledged by the Supreme Court and reiterated by the Eleventh Circuit, Title VII is not a "general civility code." *See e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Reeves*, 594 F.3d at 809. Thus, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (internal citations omitted).

Though Plaintiff has argued he subjectively felt the environment at Marketopia was abusive, this argument is undercut by his own deposition testimony and actions. At deposition, Plaintiff was asked directly whether there were any other instances in which Mr. Hedden had used the term flamboyant beyond the

9

September 2021 incident (Doc. 63-1, at 208:3–6). Plaintiff responded "No." (Doc. 63-1, at 208:7). Moreover, though Plaintiff cites to considerations of resignation as evidence of the alleged abusive working environment, this did not occur until January 19, 2022, months after the flamboyant comment had been made and a day after receiving a 90-day review he was not happy with (Doc. 63-1, at 3–9). This evidence does not support a subjective belief that Defendant's conduct was so severe or pervasive that it created a hostile working environment.

However, even assuming Plaintiff believed the alleged harassment created an abusive workplace, this perception would not be objectively reasonable. Turning to the factors presented in *Harris*, the conduct occurred only once,[3] was not sufficiently severe, and was not physically threatening or humiliating. Moreover, there is no evidence to suggest that the conduct affected Plaintiff's work performance. An abusive work environment can "detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Harris*, 510 U.S. at 22. Here, as an indicated above, there is no evidence that Plaintiff attempted to resign until months after the alleged incident occurred nor is there any indication that Plaintiff was hindered in his job

---

[3] Plaintiff argues Mr. Hedden referred to Plaintiff as flamboyant more than once by citing to a vague portion of the deposition testimony of Marketopia employee Kevin Sabourin (*See* Doc. 63-13 at 110:13-20). However, in **multiple** portions of his deposition, Mr. Sabourin clearly and unequivocally states that he heard the term flamboyant used only once. (Doc. 63-13, at 129:25–130:22, 160:6–16, 166:20–167:10). Mr. Sabourin also recalled an instance in which Mr. Hedden commented awkwardly on Plaintiff's hairstyle (Doc. 63-13, at 114:9–20). However, there is no evidence to suggest this interaction was harassment based on Plaintiff's sexual orientation. Moreover, even if it could be classified as such, the Court's overall analysis remains unchanged.

performance or prevented from advancing in his career as he was offered UAR's at his performance review.

For these reasons, the Court finds that under the totality of the circumstances there is no genuine issue of material fact concerning whether Defendant's conduct was severe or persuasive enough to create a hostile working environment. Accordingly, Defendant is entitled to summary judgment on Plaintiff's claims of sexual harassment under Title VII and the FRCA.

### B. Sex Discrimination

Title VII prohibits discrimination on the basis of sex, including sexual orientation. *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644 (2020) To prove discrimination based on sex, a Title VII plaintiff may rely on direct evidence, circumstantial evidence, or statistical proof. *Alvarez v. Royal Atl. Devs., Inc.,* 610 F.3d 1253, 1264 (11th Cir. 2010). Courts assessing such claims based on circumstantial evidence generally apply the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The *McDonnell Douglas* framework, however, is not the only means by which a plaintiff can prove discrimination or retaliation with circumstantial evidence. "Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). The Eleventh Circuit often refers to this approach as establishing a "convincing mosaic of discrimination." *See e.g.*, *Lewis v. City of Union City, Georgia*, 934 F.3d 1169 (11th Cir. 2019). Key considerations in

establishing a "convincing mosaic" include: 1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent may be drawn; 2) systematically better treatment of similarly situated employees; and 3) that the employer's justification is pretextual. *Lewis*, 934 F.3d. at 1185.

In his response, Plaintiff does not dispute that he has failed to establish a prima facie case of discrimination under the *McDonnell Douglas* framework. Instead, Plaintiff argues that the record establishes a convincing mosaic from which "an inference of discrimination against gay individuals can certainly be made" (Doc. 68, at 11). In support thereof, Plaintiff cites to the fall out surrounding his objection to the use of the term "flamboyant" and further argues that fellow employee Jeff Laws had a known history of making inappropriate, sexual comments and was not fired because he was straight (Doc. 68, at 12). As evidence of this, Plaintiff cites to deposition testimony from Mr. Sabourin indicating that Mr. Laws had been reported to HR over 30 times, had used Marketopia's credit card to take work colleagues to a strip club in Las Vegas without penalty, and had talked with other employees about his "ball (testicle) soap" but was never fired (Doc. 68, at 12). Plaintiff also reported personally witnessing Laws make an inappropriate comment about another employee's breasts in front of that employee and walking that employee through how to report such conduct (Doc. 63-1, at 384–85). In response, Defendant argues that Plaintiff was fired because of the documented complaints against him made by eight employees (Doc. 69, at 6). Defendant further maintains

that Plaintiff has failed to link the Heddens alleged homophobic beliefs to his termination on the day Santos gave the Heddens her investigative summary outlining Plaintiff's misconduct (Doc. 69, at 6).

In reviewing the evidence, the Court finds that Plaintiff has put forth enough evidence from which a convincing mosaic of discrimination may be inferred. In evaluating the considerations set forth *Lewis*, the Court first notes the suspicious timing of Plaintiff's termination. Defendant argues that Plaintiff had been under investigation by Ms. Hedden for weeks prior to Plaintiff's complaint about the flamboyant comment and the investigative summary presented by Ms. Santos on January 27, 2022, was an intervening act justifying his termination (Doc. 57, at 21). However, the evidence supporting this timeline is ambiguous at best. It is undisputed that Ms. Hedden began an investigation into Plaintiff following the posting of the Glassdoor review attributed to Sellers on December 3, 2021 (Doc. 57-2, ¶ 10–12; Doc. 57-3, p. 216:6–9, Doc. 68, p. 4–5).

To this very point, a meeting with Ms. Hedden, Plaintiff, and HR specialist Alex Mayes was held on December 15, 2021 (Doc. 64-1, p. 42–44). At this time, Ms. Hedden was aware of the complaints made to prior HR director Roneree by Armani Cooper, Josh Sellers, and Jackson Bennett as well as other complaints made by or about Plaintiff's interactions and behaviors towards employees Amber Keeger, Misty Aquel, Tiffany Rivieccio, and Brad Garinger (Doc. 57, at 2; Doc. 64-1, p. 42–44). Plaintiff was not fired then, and beyond Ms. Hedden's testimony, there is little evidence in the record to show that an investigation into Plaintiff continued

13

after this meeting. To this point, Ms. Santos testified that Ms. Hedden came to her <u>after</u> the flamboyant comment controversy and requested that she interview a designated list of individuals about Plaintiff (Doc. 63-14, at 34, p. 133:19–134:7; Doc. 63-15, at 44, p. 175:20–25). According to Ms. Santos, Ms. Hedden's reason for the sudden request was that she had received an additional "anonymous complaint" about Plaintiff (Doc. 63-14, at 34 p. 133:24–135:7). Though the testimony of Ms. Santos and Ms. Hedden conflicts, it is undisputed that Ms. Santos began conducting recorded interviews days after the flamboyant comment controversy and presented a summary to Ms. Hedden on December 27th (Doc. 63-14, at 35–38; Doc. 64-1, at 81–84, 100–150; Doc. 57, at 13, Doc. 68, at 8). Plaintiff was fired the same day (Doc. 57, at 11; Doc. 68, at 9; Doc. 63-10, at 77–78).

While Ms. Santos' summary does appear to provide some new information about Plaintiff's behavior, the substance and sources of the complaints mirror much of which was already known by the Heddens (*See* Doc. 64-1, at 81–84). For example, in preparation for Plaintiff's 90-day review, Mr. Hedden solicited feedback regarding Plaintiff's behavior from three of the five people Santos conducted recorded interviews with days later (*See* Doc. 63-12, at 48:12–53:17). Still, Plaintiff passed his review and was awarded UAR's by Mr. Hedden (Doc. 63-12, at 54). Similarly, every person Ms. Santos conducted a recorded interview with was referenced in some manner in Ms. Hedden's recap email of the December 15, 2021 meeting (*See* Doc. 64-1, p. 42–44). Is it possible that these witnesses were more forthcoming with Ms. Santos and the totality of the complaints was the motivating

14

factor behind Marketopia's decision to terminate Plaintiff on the 27th? Yes, but such a determination by this Court would invade the province of the jury. Plaintiff has put forth enough evidence from which it could be inferred that the complaints against him were mere pretext and the true motivating factor behind his termination was discrimination against him based on his sexual orientation.[4] *See Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020) ("Thus, to establish pretext at the summary judgment stage, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.") (internal quotations omitted).

To this point, the Court acknowledges that though Mr. Laws, a sales employee who was not a part of Marketopia's executive team, may not qualify as a true comparator under the *McDonnell Douglas* framework, Mr. Sauborin's testimony does establish an *inference* of systematic treatment. Thus, the Court reiterates *Smith* and finds that Plaintiff's sexual discrimination claims under Title VII and the FCRA

---

[4] Defendant argues that it is entitled to the same actor inference as Terry and Andra Hedden were aware of Plaintiff's sexual orientation when they hired Plaintiff, and it was Ms. Hedden who fired Plaintiff (Doc. 57, at 20). The same actor inference provides that where "the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *E.E.O.C. v. Fla. Com. Sec. Servs., Corp.*, No. 13-20465-CIV, 2014 WL 4771887 (S.D. Fla. Sept. 24, 2014) (internal quotations omitted). However, as noted in the very case cited by Defendant, "same actor" evidence constitutes evidence **from which a jury—not the court**—is permitted to infer that [the employer] terminated [the plaintiff] for non-discriminatory reasons. *Williams v. Vitro Servs. Corp.*, 144 F.3d 1438 (11th Cir. 1998). Accordingly, the Court will not apply the same actor inference on summary judgment in the instant case.

narrowly survive summary judgment as he has "present[ed] circumstantial evidence that creates a triable issue concerning [Defendant's] discriminatory intent." *Smith*, 644 F.3d at 1328. Though Plaintiff's sexual discrimination claim escapes summary judgment, the Court notes that the evidence presented by Plaintiff establishing a genuine issue of material fact is scant and narrowly establishes the minimum threshold required to survive summary judgment.

### C. Retaliation

To establish a prima facie case of retaliation, Plaintiff must show 1) he engaged in a statutory protected activity; 2) he suffered an adverse employment action; and 3) there was a casual connection between the protected activity and the adverse employment action. *Copeland v. Georgia Dep't of Corr.*, 97 F.4th 766, 782 (11th Cir. 2024). Here, Plaintiff argues: 1) he engaged in statutorily protected conduct by objecting to Mr. Hedden's use of the term "flamboyant" on January 19, 2022; 2) he suffered an adverse employment action by being fired on January 27, 2022; and 3) a causal connection exists through temporal proximity alone as these events occurred within eight days of each other (Doc. 68, at 15–16). In response, Defendant again argues there is no temporal proximity as the production of Santos' investigative summary was an intervening act that eroded any perceived causal connection (Doc. 57, at 21–25). In a footnote, Defendant further argues that Plaintiff's conduct was not statutorily protected as it was not objectively reasonable (Doc. 57, at 22 n.3). The Court addresses this point first.

To demonstrate he engaged in a statutorily protected activity, Plaintiff must show 1) he had a good faith, reasonable belief that Marketopia was engaging in unlawful employment practices and 2) the belief was "*objectively* reasonable in light of the facts and record presented." *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311–1312 (11th Cir. 2002) (emphasis in original). Here, Plaintiff subjectively believed that Mr. Hedden's use of the term "flamboyant" to describe his dress was impermissible discrimination based on his sexual orientation, and this belief was objectively reasonable. Thus, the Court turns to the third element – the casual connection. The Eleventh Circuit construes the casual link element broadly. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1278 (11th Cir. 2008) ("We construe the causal link element broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." (internal quotations omitted)).

To demonstrate a causal connection, a plaintiff must show: 1) the decisionmakers knew of his protected activity and 2) the protected activity and the adverse action weren't "wholly unrelated." *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) In this instance, though there is dispute as to which Hedden made the ultimate decision to terminate Plaintiff, both were involved in Plaintiff's complaint regarding the flamboyant comment. Moreover, only eight days separated this activity and Plaintiff's termination. Thus, Plaintiff has established a prima facie case for retaliation. *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (finding a seven-week gap between a protected activity and

17

adverse action sufficient to establish a causal connection based on temporal proximity).

Once a prima facie case has been established, the burden shifts to the defendant to rebut the presumption of retaliation by producing a legitimate reason for the adverse employment action. *Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir.1999). If the defendant offers a legitimate reason, the presumption of retaliation disappears, and the plaintiff must show that the employer's proffered reason was merely pretext. *Id.* Here, Defendant has offered a legitimate reason, the complaints against Plaintiff as summarized in Santos' investigative summary. However, as discussed at length above, given the timeline and treatment of other employees, Plaintiff has produced evidence to suggest Defendant's proffered reason is merely pretext. Thus, Plaintiff's retaliation claims under Title VII and the FCRA survive summary judgment. As with Plaintiff's sexual discrimination claim, the Court highlights that Plaintiff's evidence is just sufficient enough to withstand summary judgment.

### IV. Conclusion

Accordingly, it is hereby

ORDERED:

1. Defendant's Motion for Summary Judgment (Doc. 57) is GRANTED IN PART to the extent that partial summary judgment is entered in favor of Defendant on Count I and Count II of Plaintiff's Complaint.

2. The Motion is DENIED in all other respects.

DONE AND ORDERED in Tampa, Florida, on this 14th day of March 2025.

*[signature]*

ANTHONY E. PORCELLI
United States Magistrate Judge

cc: Counsel of Record